UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

WILLIAM T. GRANT,

                Plaintiff            DECISION AND ORDER

-vs-

                                                                03-CV-6037 CJS

DR. LESTER WRIGHT, DR. SINHA,
SUPERINTENDENT JOHN BEAVER, DEP.
E.C. MCPHERSON, JUDITH CRAMER, MRS.
JAMES, Nurse Administrator,

                Defendants

_____

APPEARANCES

For Plaintiff:            Scott M. Mooney, Esq.
                             Boylan, Brown, Code, Vigdor & Wilson, LLP
                             2400 Chase Square
                             Rochester, New York 14604-1915

For Defendants:        J. Richard Benitez, Esq.
                             Office of the New York State
                             Attorney General
                             144 Exchange Boulevard
                             Rochester, NY 14614

INTRODUCTION

This is an action pursuant to 42 U.S.C. § 1983 in which the plaintiff, William T. Grant ("Plaintiff"), formerly[1] a prison inmate formerly housed at Orleans Correctional Facility ("Orleans"), alleges that Defendants violated his rights under the Eighth Amendment with regard to his medical needs and his conditions of confinement. Now

---

[1] According to records of the New York State Department of Correctional Services, Plaintiff was released from prison on October 5, 2007.

1

before the Court is the Defendants' summary judgment motion [#41]. For the reasons that follow, Defendants' application is granted.

BACKGROUND

For purposes of the instant motion, the following are the undisputed facts of this case, viewed in the light most favorable to Plaintiff. In that regard, the Court notes that, in connection with the subject summary judgment motion, none of the parties submitted affidavits. Consequently, the following facts are taken from Plaintiff's verified complaint, Defendants' Rule 26 disclosures, and the exhibits to Plaintiff's attorney's affirmation.

At all relevant times, Plaintiff was an inmate in the custody of the New York State Department of Correctional Services ("DOCS"); defendant Lester Wright, M.D. ("Wright") was DOCS's Chief Medical Officer; defendants Brij Sinha, M.D. ("Sinha") and Judith Cramer, M.D. ("Cramer") were medical doctors employed by DOCS; defendant B. James, R.N. ("James") was a registered nurse employed at Orleans; defendant John Beaver ("Beaver") was the Superintendent at Orleans; and defendant E.C. McPherson ("McPherson") was Deputy Superintendent for Administrative Services at Orleans.

At all relevant times, Plaintiff was approximately 5' 10" and weighed approximately 475 pounds. Due to his size, Plaintiff could not wear ordinary-sized clothing, nor could he sleep comfortably in a normal-sized bed. Additionally, prior to December 2001, Plaintiff suffered a stroke that left him partially paralyzed on his left side. Following his stroke, and prior to December 2001, Plaintiff was housed at Walsh Regional Unit ("Walsh"), a DOCS medical facility, where, he concedes, he received

appropriate medical treatment. (Complaint ¶ 18). In or about late-December 2001, DOCS transferred Plaintiff to Orleans, with the intention of placing him in that facility's handicap-accessible dormitory ("handicapped dorm"). On or about April 1, 2002, DOCS transferred Plaintiff to another medical facility. Plaintiff's claims arise from events that occurred during the period of approximately three months that he was housed at Orleans.² For "a great portion of that time," Plaintiff was housed in Orleans's medical infirmary, where he was kept while special clothing was being made for him.³ (Complaint ¶ 19). During the remainder of that time, Plaintiff was housed in the handicapped dorm, though he apparently ate his meals in the facility mess hall used by general-population inmates.

On January 14, 2002, while Plaintiff was housed in Orleans's infirmary, someone, whose signature is illegible, completed a form entitled "Handicapped Assessment" concerning Plaintiff. Apparently, the assessment was designed to determine whether or not Plaintiff should be housed in the handicapped dorm. The form indicated that Plaintiff could feed and groom himself, and that he could bathe himself with assistance. The form also indicated that Plaintiff could ambulate short distances using a cane, and that he also had a wheelchair. However, the form

---

²Plaintiff was transferred to Orleans in late-December 2001, and was transferred to Wende Correctional Facility on April 1, 2002. The actual date that Plaintiff arrived at Orleans is unclear in the record. However, Plaintiff indicates that he was at Downstate Correctional Facility prior to being sent to Orleans, and Exhibit B to the Mooney Affirmation indicates that Plaintiff was not transferred to Downstate ("DCF") until December 17, 2001.

³See, for example, Plaintiff's Complaint at ¶ 3, where he alleges that Defendants "arbitrarily confined" him at Orleans's infirmary. Additionally, numerous documents written in January and February 2002 indicate that Plaintiff was then housed in the infirmary.

indicated that Plaintiff was not able to dress himself, or to "travel through the compound." With regard to his alleged inability to dress himself, it appears that Plaintiff's main, if not only, complaint, was that he had difficulty putting on his socks and tying his shoes. (Rule 26 Disclosure, James Memo, Bates Stamp 000002; Mooney Affirmation, Exhibit B, February 16, 2002 Appeal Statement ("Can't bend and put socks and tie my boots without gadget that PT gave me.")). Moreover, the finding concerning Plaintiff's alleged inability to "travel through the compound" was apparently based on his own statement, as opposed to any objective evaluation. (Mooney Affirmation, Exhibit B) ("Per pt."). In any event, based on this assessment, the person completing the form indicated that Plaintiff was not "handi-capable," meaning that he was not "able to live in the self-care handicapped setting at Orleans Correctional Facility." (Mooney Affirmation, Exhibit B).

On January 22, 2002, during a medical call-out visit, while he was still housed in the infirmary, Plaintiff told a nurse that he was "unable to function in this facility in population." (Mooney Affirmation, Exhibit D). According to Plaintiff, by stating that he was not able to function "in population," he was indicating that he could not function in the handicap-dorm at Orleans, and that he wanted to be transferred to one of DOCS's Regional Medical Units ("RMUs"), in which he could receive more intensive care. (*See, e.g.*, Complaint ¶¶ 4, 5, 12).

On January 18, 2002, Plaintiff filed an inmate grievance, Grievance ORL-

15296-02, which stated:

> I am a male 5'10" 462 lbs who is paralyzed on my left side. I can't make it [in] gen[eral] population. [I am] in need of special attention. Also I have a bad leg ulcer which is open. Please check my handicap acceptable form. Also [I] don't have the proper clothes for winter.

Plaintiff also requested, in the grievance, that he be allowed to "get to a place so I can finish my therapy so I can try to do things myself." At the time Plaintiff wrote this grievance, he was still housed in Orleans's infirmary, not the handicapped-dorm.[4] Nevertheless, the Inmate Grievance Review Committee ("IGRC") apparently forwarded the complaint to James, who responded by providing a memo from Sinha to McPherson concerning Plaintiff, dated January 25, 2002, which stated:

> This inmate was transferred here to access general population and the handicapable dorm unit. He is post stroke and recovered to the maximum limit.
>
> In my opinion, the best place for him is in the handicapped dorm. He does his own routine . . . and walks to the bathroom and in the hallway without difficulty. As regarding his weight, it is not possible to reduce it over months. He needs to be active. The state shop was contacted regarding suitable clothing upon his arrival.

(Defendants' Rule 26 Disclosures, Bates Stamp 000006). After the IGRC relayed this information to Plaintiff, he appealed to Beaver, who concluded that Plaintiff was properly placed at Orleans, "since the facility is handicapable." Beaver further stated that "[w]hen the [specially ordered] clothing is issued to the grievant, he will

---

[4] During oral argument, Plaintiff's counsel suggested that the infirmary and the handicap-dorm were one and the same. However, the record indicates otherwise.

be placed in a handicapable housing unit," and he advised Plaintiff "to sign-up for sick-call in order to discuss his medical needs with the Medical staff." (Id., Bates Stamp 000005). Plaintiff appealed, apparently because he believed that officials at Orleans had not reviewed all of his medical records before forming an opinion as to his abilities. (Id.). The DOCS Central Office Review Committee ("CORC") affirmed Beaver's determination, stating: "CORC notes that the grievant is appropriately housed in the handicapped dorm at this time. It is noted that the grievant is able to ambulate and that he can access sick call regarding his medical complaints." (Id., Bates Stamp 000004).

On February 10, 2002, Plaintiff filed another inmate grievance, Grievance ORL-15312-02, complaining about a "failure to furnish the assistance I need to live a minimally decent life as a handicap person which I am paralyzed on my left side can't bend over to put on my socks and dress myself." He requested that he be provided physical therapy, and that he be transferred to "a facility compatible with physical condition that meet civilized standards of decency." The facility grievance clerk apparently forwarded a copy of the grievance to Nurse James, who, on February 13, 2002, responded:

> Mr. Grant is a heavy man. He remains in the infirmary until his specially ordered clothing arrives for him as he was sent here with poorly fitted clothes. He currently has problems putting his socks on because they are too tight. Looser socks have been ordered by the state shop, so these should be easier to put on. He has velcro shoes which should be easy to fasten.
>
> Both the reception facility, Central Office DOCS and the physicians at

6

> this facility feel that he can function in population. Only if he tries to function will it be able to be determined if he really can or cannot.
>
> As for PT [physical therapy], he already had a full course of treatment - further PT benefit may not be justified. This is something for the MD to decide and prescribe only if improvement can be predicted. He may speak to the physician about this.

(Defendants' Rule 26 Disclosures, Bates Stamp 000002). On February 21, 2002, the Inmate Grievance Review Committee ("IGRC") relayed James's statements to Plaintiff, and it is unclear whether Plaintiff did anything further with regard to that grievance complaint.

> On February 15, 2002, Plaintiff wrote to "Health Dept," stating:
>
> I am writing to you about the poor medical care assistance by your doctors at [Orleans]. I am a very large man 470 pounds with a stroke [paralyzed] on my left side not able to fully dress myself without [sic] doing a full investigation with my medical records which Doctor has not gotten upon my arrival at the jail. Ask to be seen by P.T. to [assess] my well being but I was [denied] by Dr. Sinha. I been at Walsh Medical for 4 years was given a lot of help with things to help me dress myself being [phased] into gen population which I can't help myself ask for gadgets that I had to help me do the things myself can't depend on other inmates to put on my socks and wash one side of my body. Told Dr. I can't do it. At home I have a nurse come to do the things I can't do like putting on my socks and shoes. I have [a] long [sponge] to help me wash. Can you please look into this matter please.

(Id., Bates Stamp 000022). On April 9, 2002, Wright responded, stating:

> This is in response to your letter of February 15, 2002. The Division of Health Services has investigated your concerns with the health staff at Orleans Correctional Facility.
>
> You were recommended for a comprehensive therapy regimen on March 25, 2002. Approval is anticipated shortly. Your medical record has also been reviewed for possible admission to a Regional Medical

>Unit.
>
>It is suggested that you continue to bring your concerns to the attention of the health care staff using the existing sick call procedures. I am sure they will make every effort to address your needs.

(Id., Bates stamp 000021). As mentioned earlier, Plaintiff was transferred from Orleans to another DOCS medical facility on or about April 1, 2002, and consequently he left Orleans between the date of his letter and the date of Wright's response. Nevertheless, Wright's letter apparently referred to the fact that, in or about March 2002, in response to Plaintiff's complaints, DOCS had defendant Cramer visit Plaintiff at Orleans and evaluate him. (Complaint ¶ 9). Based upon Cramer's evaluation, Plaintiff was transferred to Wende Correctional Facility's ("Wende"), where, he alleges, "he should have been in the beginning." (Id. at ¶ 14).

However, prior to his transfer, in or about March 2002, Plaintiff was sitting on a stool in the Orleans mess hall, when he fell to the floor and injured his back. According to Plaintiff, the stool was "not designed for the handicap nor able to hold plaintiff who at the time weighed 475 pounds." (Complaint ¶ 3). Since injuring his back, Plaintiff has been "heavily medicated with various forms of drugs to ease the physical and mental pain." (Id.).

On January 24, 2003, Plaintiff commenced the subject action, proceeding *pro se*. In that regard, Plaintiff alleges that Defendants violated his constitutional rights in several respects. First, he alleges that Defendants transferred him to

8

Orleans improperly, since the facilities were not adequate and the staff was not properly trained. Additionally, he contends that the handicapped-dorm at Orleans lacked a sufficient number of handicap-accessible toilets, and that the beds were too small for him. He further alleges that Defendants failed to provide him with sufficient clothing. And finally, he alleges that the stool from which he fell was not appropriate for him.

On February 24, 2005, Plaintiff filed an application for injunctive relief, complaining about conditions at Coxsackie Correctional Facility ("Coxsackie"), which the Court granted. Notably, as part of his application for injunctive relief, Plaintiff stated that since his stroke, he was unable to sleep lying down, and preferred to sleep in his wheelchair. (Motion for Injunctive Relief [#18]) ("I have been sleeping in wheelchair for over 3 years being that I have had a major stroke [and] can't lie down for any time at all."). Although the request for injunctive relief was unrelated to the issues in this case, DOCS did not oppose the request, and the Court granted it.

Following the completion of discovery,[5] on November 16, 2007, Defendants filed the subject motion for summary judgment. As mentioned earlier, Defendants have not submitted supporting affidavits. Nor do they challenge Plaintiff's version

---

[5]Plaintiff's counsel states that the Court should deny the summary judgment because Defendants failed to respond to a discovery demand. However, the Court rejects that argument. In that regard, the last Scheduling Order in this case set a cutoff date for discovery of August 8, 2007, and directed that all motions to compel discovery be filed at least 30 days prior to that date. (Amended Scheduling Order [#34]). Plaintiff never filed a motion to compel, and never sought an extension of the discovery deadline.

of the facts. Instead, they contend that, as a matter of law, the facts, as alleged in Plaintiff's complaint and as contained in the discovery materials, fail to establish any constitutional violation. Instead, they contend, the facts show, at most, that Defendants were negligent. (Defendants' Memo of Law at 3) ("[T]here is no evidence that [Defendants] knew of and disregarded an excessive risk to the inmate's health or safety. Therefore, under no circumstances could Plaintiff prevail before a jury.").

On March 24, 2008, Plaintiff filed a response.[6] Plaintiff contends that Defendants have failed to carry their burden of demonstrating an absence of evidence to support his case, and that there are triable issues of fact as to whether Defendants violated his constitutional rights. In that regard, Plaintiff maintains that the "Handicapped Assessment Form," as well as his two inmate grievances, create an issue of fact as to whether Defendants acted with deliberate indifference by placing Plaintiff in the handicapped dorm. On May 1, 2008, counsel for the parties appeared before the undersigned for oral argument of the motion.

DISCUSSION

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to

---

[6]On March 3, 2006, the Court assigned counsel to represent Plaintiff. (Order [#29]).

a judgment as a matter of law." Fed.R.Civ.P. 56(c).  A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.).

The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e);  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249; *see also*, FED. R. CIV. P. 56(e)("When a motion for summary judgment is made and supported as provided in this rule, and adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.").  Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).  The parties may only carry their respective burdens by producing evidentiary proof in admissible form. FED. R. CIV. P. 56(e).  The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Where, as in the instant case, the non-moving party has the burden of proof at

trial, "the movant may satisfy [its] burden [on summary judgment] by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), *cert denied*, 517 U.S. 1190 (1996). In that regard,

> the moving party does not, however, bear the burden of proving that his opponent's case is wholly frivolous.
> \*\*\*
> [W]here the moving party has attempted to demonstrate that the nonmoving party's evidence is insufficient as a matter of law to establish his claim, the burden shifts to the nonmoving party to come forward with persuasive evidence that his claim is not "implausible." The question then becomes, is there sufficient evidence to reasonably expect that a jury could return a verdict in favor of the nonmoving party. In evaluating the sufficiency of the nonmoving party's evidence, however, courts must still proceed very cautiously. If reasonable minds could differ as to the import of the evidence, and if there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment.

*Brady v. Town of Colchester*, 863 F.2d 205, 210-211 (2d Cir. 1988) (citations and internal quotation marks omitted).

Plaintiff is suing pursuant to 42 U.S.C. § 1983, and the legal principles applicable to such claims are well settled:

> In order to establish individual liability under § 1983, a plaintiff must show (a) that the defendant is a "person" acting "under the color of state law," and (b) that the defendant caused the plaintiff to be deprived of a federal right. See, *e.g., Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Additionally, "[i]n this Circuit personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir.1977).
> \*\*\*
> An individual cannot be held liable for damages under § 1983 "merely because he held a high position of authority," but can be held liable if he was personally involved in the alleged deprivation. *See Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir.1996). Personal involvement can be shown by:

> evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring. *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.1995).

*Back v. Hastings On Hudson Union Free School Dist.*, 365 F.3d 107, 122, 127 (2d Cir. 2004).

Plaintiff is asserting Eighth Amendment claims directed at his medical treatment and his conditions of confinement. With regard his claims for denial of medical treatment, the legal standard is clear:

> In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove deliberate indifference to his serious medical needs. This standard incorporates both objective and subjective elements. The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind.
>
> Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation. [T]he Supreme Court [has] explained that the Eighth Amendment's prohibition on cruel and unusual punishments encompasses the deliberate failure to treat a prisoner's serious illness or injury resulting in the infliction of unnecessary pain and suffering. Because society does not expect that prisoners will have unqualified access to health care, a prisoner must first make this threshold showing of serious illness or injury in order to state an Eighth Amendment claim for denial of medical care. Similarly, a prisoner must demonstrate more than an inadvertent failure to provide adequate medical care by prison officials to successfully establish Eighth Amendment liability. An official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety, a state of mind equivalent to the familiar standard of 'recklessness' as used in criminal law.

*Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir.2003) (citations and internal quotations omitted). Courts have repeatedly held that disagreements over treatment do not rise to the level of a Constitutional violation. *See, Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir.1998)("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim."). Similarly, negligence constituting medical malpractice, without more, will not establish a constitutional claim. Id. (citation omitted).

With regard to claims directed at an inmate's conditions of confinement, the legal principles are similarly well-settled:

> The conditions of a prisoner's confinement can give rise to an Eighth Amendment violation.  In such cases, a prisoner may prevail only where he proves both an objective element-that the prison officials' transgression was sufficiently serious-and a subjective element-that the officials acted, or omitted to act, with a sufficiently culpable state of mind, i.e., with deliberate indifference to inmate health or safety.
>
> Regarding the objective requirement, the Supreme Court has explained that while the Constitution does not mandate comfortable prisons, prisoners may not be denied the minimal civilized measure of life's necessities. Under the Eighth Amendment, States must not deprive prisoners of their basic human needs- e.g., food, clothing, shelter, medical care, and reasonable safety.  Nor may prison officials expose prisoners to conditions that pose an unreasonable risk of serious damage to their future health. Ultimately, to establish the objective element of an Eight Amendment claim, a prisoner must prove that the conditions of his confinement violate contemporary standards of decency.
>
> Concerning the subjective requirement, the Supreme Court has explained that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.  This deliberate indifference element is equivalent to the familiar standard of recklessness as used in criminal law.  Whether a prison official had the requisite knowledge of a substantial risk is a question of fact

> subject to demonstration in the usual ways, including inference from circumstantial evidence and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.

*Phelps v. Kapnolas*, 308 F.3d 180, 185-86 (2d Cir. 2002) (citations and internal quotation marks omitted).

Applying the foregoing legal principles to the facts of this case, the Court finds that Defendants are entitled to summary judgment.

*Placement of Plaintiff at Orleans*

Plaintiff alleges that Defendants acted with deliberate indifference to his medical needs by placing him at Orleans, where, he contends, the facilities and staff were inadequate for someone with his medical condition. In this regard, he relies on the January 14, 2002 "Handicapped Assessment" form discussed above, as well as his own opinion, expressed in his grievance complaints, that he could "not function" in the handicapped dorm. However, neither the "Handicapped Assessment" form, whose author is unknown, nor any other evidence in the record, creates a triable issue of fact as to deliberate indifference. Assuming, *arguendo*, that Plaintiff had an objectively serious medical need, the evidence at most shows a disagreement over treatment. In that regard, Sinha indicated that Plaintiff needed to be active, and that Plaintiff could function in the handicapped dorm, based on the objective evidence of his physical limitations. For example, Sinha indicated that Plaintiff "did his own routine" and walked to the bathroom and through the hallways "without difficulty." Although the "Handicapped Assessment" indicates that Plaintiff could not "travel through the compound," that

finding was based on a statement from Plaintiff, which is hearsay. Moreover, there does not appear to have been any factual basis for Plaintiff's statement, since he was housed in the infirmary at the time, and there is no indication that he had ever attempted to function in Orleans's handicapped dorm. Additionally, in that regard, Plaintiff has not come forward with evidentiary proof in admissible form indicating that he could not travel through the compound by himself. To the contrary, for example, he states that he was able to go to the mess hall.[7] Moreover, James stated: " Both the reception facility, Central Office DOCS and the physicians at this facility feel that he can function in population. Only if he tries to function will it be able to be determined if he really can or cannot." Significantly, DOCS transferred Plaintiff to Orleans only after determining that he had reached maximum medical improvement at Walsh, where he had been housed for four years. Moreover, Plaintiff was in the handicapped dorm at Orleans for approximately only one month, after which DOCS transferred him to facility with better physical therapy options. Consequently, the Court finds that no reasonable jury could find that Defendants acted with deliberate indifference toward Plaintiff's medical needs.[8]

*Inadequate Toilets, Bed and Clothing*

---

[7] At most, the verified complaint states that Plaintiff could "barely walk" following his fall from the mess hall stool, due to back pain. (Complaint ¶ 24).

[8] Even assuming that Plaintiff could demonstrate that a constitutional violation occurred, he has not shown personal involvement by the Defendants, with the possible exception of Sinha. For example, he has not shown that Beaver, McPherson or James were involved in the decision to send him to Orleans. As for Wright and Cramer, there is similarly no evidence that they were personally involved in the decision, and, to the contrary, it appears that they were involved in the decision to move him to another facility where he could receive physical therapy.

Plaintiff also alleges that Defendants acted with deliberate indifference to his health and safety by failing to provide him with sufficient clothing, and by placing him in a dormitory with inadequate toilets and beds. At the outset, it does not appear that these claims are actionable, since Plaintiff did not exhaust his administrative remedies as to them. *See*, 42 U.S.C. § 1997e(a). Even assuming that Plaintiff had exhausted his administrative remedies with regard to those complaints, he has not shown that any of those conditions was, objectively, sufficiently serious. In that regard, Plaintiff relies solely on his verified complaint, in which he makes only conclusory allegations regarding the toilets, bedding, and clothing. For example, he alleges that he " could not fit into the narrow small steel beds designed for a person of average weight and height. Plaintiff 475 pounds struggle [sic] in pains as he tried day in and day out to force himself to sleep in the bed." (Complaint ¶ 13). However, as discussed earlier, Plaintiff stated, in his application for injunctive relief in this action, that, as a result of his stroke, he could not sleep lying down, and that instead, he slept in his wheelchair. Based on that representation, the Court granted Plaintiff's application for injunctive relief, and directed DOCS to provide him with his wheelchair at all times. Plaintiff cannot have it both ways. As for the number of toilets available to Plaintiff, he states only that, " in the bathroom, there was a single toilet that had a handicap rail to hold onto, [and that] there was only one such toilet to be shared with at least 30 inmates." (Complaint ¶ 14). However, Plaintiff never states that he was unable to use the

17

toilet when necessary, or even that he was forced to wait long periods of time to use the toilet. And, with regard to clothing, Plaintiff alleges only that "he was not provided with sufficient clothing to fit him and was forced to wear the same dirty clothing for long period[s] of time." (Complaint ¶ 16). He does not explain what he means by "sufficient," "dirty," or a "long period of time." On the other hand, the record indicates that upon Plaintiff's arrival at Orleans, officials at Orleans determined that his clothing was insufficient, and they ordered specially-made clothing for him. While waiting for the special clothing to me made, officials at Orleans kept Plaintiff in the infirmary. These facts do not satisfy the standard required to prove an Eighth Amendment violation. In short, Plaintiff has provided no evidence from which a reasonable jury could find that his conditions of confinement, with regard to toilets, bedding, or clothing, violated contemporary standards of decency, or that defendants were deliberately indifferent to such conditions.

### *Inadequate Stool in Messhall*

Finally, Plaintiff alleges that he fell from a stool in Orleans's mess hall, and injured his back. Plaintiff alleges that his fall was the result of Defendants' deliberate indifference, since the stool "was not designed for the handicap nor [was it] able to hold Plaintiff who at the time weighed 475 pounds." (Complaint ¶ 3). Plaintiff further states that defendants

> knew that Plaintiff had a stroke and was partially paralyzed on the left
> side of his body, and because of this factor he could not sit in regular

mess hall stools that had no security about them, and because of such plaintiff fell in Orleans Mess Hall trying to carry his mess hall tray and sitting in unsecured seats.

(Id. at ¶ 19).  From such vague and conclusory statements, no reasonable jury could find an Eighth Amendment violation.[9]  Consequently, Defendants are entitled to summary judgment.

## CONCLUSION

For the foregoing reasons, Defendants' application for summary judgment [#41] is granted and this action is dismissed.

So Ordered.

Dated:	Rochester, New York
	May 19, 2008

ENTER:


 /s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge

---

[9] Again, there is also no explanation as to how the individual defendants were personally involved in the incident, nor any indication that Plaintiff exhausted his administrative remedies with regard to this claim.